**REDMAN ENERGY CORPORATION and Redman Operating Company, Appellants,**

v.

**KOCH MIDSTREAM SERVICES COMPANY, Appellee.**

No. 06–00–00137–CV.

Court of Appeals of Texas, Texarkana.

Submitted April 2, 2001.

Decided May 9, 2001.

Thomas C. Wright, Laura P. Haley, Campbell Harrison & Wright, LLP, Houston, for appellant.

J. Robin Lindley, Mark A. Kerstein, Binion, Harmon & Lindley, PC, Houston, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Chief Justice CORNELIUS.

Redman Energy Corporation and Redman Operating Company (Redman) sued Koch Midstream Services Company (Koch) for breach of contract and attorney's fees. Both parties moved for summary judgment. The trial court granted Koch's motion and denied Redman's motion. Redman appeals.

This suit centers around a Gas Processing Agreement (GPA) originally executed on February 12, 1986, between Trend Resources Limited and Texaco Producing, Inc. Trend and Texaco and their successors will, in most cases, be referred to as Producer and Processor, respectively. The Producer drilled the Bonner No. 1 well in Navarro County in 1985. The well produced "sour gas" containing a high content of corrosive hydrogen sulfide, a toxic compound that required processing in or-der for the gas to be marketable. The Processor owned and operated a sulphur extraction and hydrocarbon processing plant, the Aker Processing Plant, in the vicinity of the Bonner No. 1 well. The plant required a significant quantity of sour gas in order to operate. Pursuant to the processing agreement, gas was delivered to the Aker plant by pipeline, processed at the plant, and then redelivered to the producer. The agreement contains several clauses that form the basis of the dispute between the parties.

Delhi Gas Marketing Corporation succeeded Texaco as the processor under the agreement, and Koch later succeeded Delhi as the processor and owner of the Aker Processing Plant. Trend's successors in interest were Dallas Production, Inc. (DPI), Universal Resources (Universal), and ultimately Redman, which acquired the Bonner No. 1 well in January 1998.

In June 1996, deliveries from the Bonner well to the Aker plant were suspended because of a leak in the gathering pipeline. Tests revealed that, because of corrosion, a significant portion of the pipeline required replacement. The Processor determined that either the pipeline from the well to the Aker plant required replacement or construction of a new gathering pipeline to Apache Corporation's E–2 well on an adjacent property was required. As a result, the Bonner well was shut in.

The disputed portion of the agreement provides as follows:

In the event Gas from the lease as described in Exhibit "A" attached hereto is or becomes insufficient in volume or liquefiable hydrocarbon content, **or becomes uneconomical for processing,** then Processor reserves the right to submit to Producer an alternate processing proposal. Producer shall notify Processor of its acceptance or rejection of

the alternate processing proposal within thirty days of its receipt of same.

Should Producer accept the alternate processing proposal, the terms of such proposal shall become effective on the first day of the month following such election.

Should Producer reject such alternate proposal or fail to advise Processor of its election within the thirty day period described above, this agreement shall be terminated on the first day of the month following the end of such thirty day period.

(Emphasis added.)

Delhi determined that the cost of either of the options referred to above made the processing of gas from the Bonner well uneconomical, thus triggering the above-quoted clause. Koch argues that the Processor complied with the agreement by submitting, in 1996 and 1998, letters outlining two alternative processing proposals to the Producer, and that the Producer either rejected the proposals or failed to advise the Processor of its election within the time period specified by the agreement, thus terminating the agreement either in 1996 or 1998.

Redman, the current Producer, contends that the cost of the pipeline and its replacement should not be considered in determining whether the gas has become uneconomical for processing. It argues that the gathering and processing functions are separately set forth in the agreement, and that the word "processing" means only the processing at the plant and does not include the gathering of the gas for processing. Based on this construction of the term, Redman argues that the requirement for submission of alternative processing proposals was never triggered. As an alternative, it argues that even if such termination procedures were triggered by the pipeline leak, the Processor

did not comply with the alternative proposal requirements, so the contract was not terminated, and by its refusal to repair or replace the defective gathering pipeline and failure to accept gas from the Bonner well for processing, the Processor breached the contract.

Koch contends that Redman's "gathering is not processing" argument was not presented to the trial court and therefore may not be raised on appeal.

■ The trial court made a specific finding in its final judgment that "the costs of gathering and transporting gas, including the costs of replacing the gathering line, are properly considered in a determination as to whether the 'Gas becomes uneconomical for processing,' as that term is used in Article II of the Gas Processing Agreement."

We are not dealing here with a generally worded summary judgment in favor of Koch. The trial court made a specific interpretation, as a matter of law, of a contract that both parties agree is unambiguous. In its own motion for partial summary judgment, Redman contends there must be some change in the gas itself in order to trigger the termination clause of the contract and that the Processor should have anticipated the costs of maintaining the pipeline. The arguments raised by the parties were apparently sufficient to apprise the trial court of the issues, because it made a specific finding as to what costs were included in a determination of "uneconomical." We therefore conclude that both parties adequately raised this issue in the trial court.

Although Redman's argument is phrased somewhat differently in its brief than it was stated in the trial court, the issue was clearly before the trial court, and Redman is entitled both to raise the issue

and to respond to the specific finding of the trial court.

The trial court gave reasons for granting Koch's motion for summary judgment, the first reason being that the GPA terminated on August 25, 1996, pursuant to its express terms, because the Producer failed to accept an alternative processing proposal submitted by the Processor, with the result that the Producer acquired no rights when it purchased the well in January 1998.

■ Neither party contends that the GPA is ambiguous. Because the contract is not ambiguous, its interpretation is a question of law. *DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex.1999); *Apex Fin. Corp. v. Brown,* 7 S.W.3d 820, 826–27 (Tex.App.—Texarkana 1999, no pet.). In construing a written contract, our primary concern is to ascertain the true intentions of the parties as expressed in the agreement. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *Apex Fin. Corp. v. Brown,* 7 S.W.3d at 826. In order to achieve this objective, we must consider the entire writing in an effort to harmonize and give effect to all the provisions so that none will be rendered meaningless. *Coker v. Coker,* 650 S.W.2d at 393. We consider all provisions with reference to the whole instrument. *Apex Fin. Corp. v. Brown,* 7 S.W.3d at 826. We give the language of the contract its plain semantical meaning unless to do so would defeat the parties' intention. *DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d at 101.

■ We first must determine the meaning of the provision "[i]n the event Gas from the lease ... becomes uneconomical for processing,...." If this event occurs, the right to submit an alternative processing proposal is triggered, requiring action on the part of the Producer in order to avoid termination of the agreement. The term "uneconomical" is not defined in the agreement, and according to the principles articulated above, we must give the term its plain semantical meaning.

Uneconomical means not economically practicable, costly, wasteful. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1290 (10th ed.1993). The term has also been defined as "wasting money or costly." *Royal Auto Parts v. State,* 118 Mich.App. 284, 324 N.W.2d 607, 610 (1982).

Redman does not dispute this general definition; rather, it argues that the term should be construed considering the entire phrase, "Gas from the lease ... becomes uneconomical for processing." It contends that the contract treats gathering and processing as separate functions, and that to become uneconomical for processing the distinct act of processing itself must become costly, wasteful, or unprofitable without reference to the act of gathering the gas from the Bonner well for delivery into the processing plant.

An examination of the agreement as a whole does not support Redman's contentions. We note, for example, the third "WHEREAS" clause, which contains the objective and purpose of the agreement:

Producer desires that Processor take delivery of the gas at the Delivery Point, as hereinafter defined, for the processing and removal of products as hereinafter stated, and desires that Processor deliver the residue gas to Gas Purchaser after the removal of products as hereinafter provided.

We further note the first sentence of Article II, "SCOPE AND TERM":

Processor shall accept delivery of all said Gas currently as available, and shall gather and process such Gas and redeliver the Residue Gas at the outlet of Processor's Plant for the account of Producer.

The following provisions in the contract also appear to exhibit an intention to make the gathering of the gas for delivery to the plant for processing, and then delivery to the purchaser, integral parts of the "processing" function:

"Delivery Point" shall mean the point at which Producer delivers the Gas to Processor at the outlet of Producer's gas well, . . . .

Art. I, (5).

Processor shall accept delivery of all said Gas . . . and shall gather and process such Gas and redeliver the Residue Gas at the outlet of Processor's Plant. . . .

Art. II.

Processor shall construct the necessary gathering and fuel pipelines including appurtenant facilities from the Delivery Point to the Plants.

Art. III.

The Gas to be processed hereunder shall be delivered by Producer to Processor at the Delivery Point at sufficient pressure to enter Processor's Plant, . . . .

Art. III.

After processing the Gas and the recovery of Plant products therefrom, Processor shall deliver the Residue Gas to Gas Purchaser's line.

Art. III.

Processor shall sample the Gas at the Delivery Point and determine by chromatograph analysis the content in gallons per thousand cubic feet (GPM) of each Plant Product recovered in the Plants.

Art. VI.

Producer shall be deemed to be in control and possession of the Gas . . . until such Gas shall have been received by Processor at the Delivery Point. . . . Processor shall be deemed to be in control and possession after receipt thereof by Processor from the Producer at such Delivery Point and prior to the delivery thereof of the Residue Gas to Gas Purchaser at the tailgate of Processor's . . . Gas Processing Plant.

Art. VIII.

The title of the contract is "Gas Processing Agreement." From the title itself and from the provisions of the agreement noted, we conclude that the purpose of the agreement was to take the gas from the Bonner well, remove the products, and then redeliver it to the Producer. Considering the contract as a whole, it appears that the parties intended that the gathering of the gas from the well in order to process it at the processing plant would be an integral part of the processing, not a separate and distinct function. *Compare Burns v. Exxon Corp.*, 158 F.3d 336, 340–41 (5th Cir.1998), which interpreted the contractual phrase "gas processing operations" to include all parts of that process. We conclude that the trial court correctly construed the GPA in this regard.

■ In order to determine whether the trial court correctly ruled that the GPA had terminated, we must also determine whether the Processor complied with the requirement that in the event the gas became uneconomical for processing, it had the right to submit to the Producer an alternative processing proposal, which if not accepted or if no notice was received by the Processor within thirty days of its submission to the Producer, would result in termination of the agreement on the first day of the month following the end of the thirty-day period.

The summary judgment evidence shows that in June 1996, deliveries through the gathering pipeline were suspended because of a leak and that tests showed that a substantial portion of the pipeline required replacement. One of two possible

means to restart the gathering of gas would have been the construction of a new 4,800–foot line from a point on the existing pipeline to Apache Corporation's Anderson E–2 well located on adjacent property. Delhi, the Processor at the time, sent a letter, dated July 26, 1996, to DPI, then the Producer, proposing that they share the cost of constructing such a new pipeline. The letter, however, references a 1993 gas purchasing agreement, not the 1986 GPA. Also, the letter does not reference the specific portion of the processing agreement that gives the Producer thirty days in which to accept or reject the alternate processing proposal, or suffer a termination of the agreement. Redman argues that because of these defects, the letter did not constitute a valid alternate processing proposal.

The letter does specifically mention the Bonner well. Moreover, neither party disputes the fact that the pipeline had a leak, resulting in the stoppage of the flow of gas to the processing plant. The affidavit of Koch's Mark Adauto, who was employed by Delhi at the time, indicates that DPI was in the process of responding favorably to the proposal, as evidenced by the draft of a proposed quitclaim, assignment, and bill of sale for the proposed pipeline and rights-of-way. Adauto further states that before formal acceptance, Universal acquired DPI's interest and wanted to explore other options. There is no indication from the dealings of the parties at that time that the Producer in any fashion objected to or opposed the Processor's determination that the gas had become uneconomical for processing. The summary judgment evidence shows that the parties at that time did not dispute the appropriate legal procedure, although they may not have agreed on an appropriate business decision.

We agree with the trial court that the letter constituted an alternative processing proposal as provided in the GPA and that the Producer's failure to timely respond resulted in the termination of the GPA on the first day of the month following the thirty-day period.

Redman argues that records and correspondence from the Processor show that its personnel did not consider the agreement to have been terminated. As noted in *Burns v. Exxon Corp.*, 158 F.3d at 340–41, evidence of such understandings do not assist us in interpreting the contract as a matter of law. They would only be helpful if the GPA was ambiguous on this point.

We therefore hold that the trial court correctly determined that the GPA was terminated on August 25, 1996.

Redman also contends that the trial court erred in overruling its own motion for partial summary judgment. As we have determined that the Processor, i.e., Koch's predecessors, complied with the terms of the contract regarding termination, it did not breach the contract, and the trial court properly overruled Redman's motion for partial summary judgment.

For the reasons stated, we affirm the judgment of the trial court.